IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| NORMA L. WALTON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 06-0823-CV-W-ODS |
| ) | |
| MICHAEL J. ASTRUE,[1] ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

<u>ORDER AND OPINION AFFIRMING COMMISSIONER'S FINAL DECISION DENYING
DISABILITY INSURANCE BENEFITS</u>

Pending is Plaintiff's request for review of the Commissioner's final decision denying her application for benefits under Title II and Title XVI of the Social Security Act. For the following reasons, the Commissioner's decision is affirmed.

<u>I. BACKGROUND</u>

Plaintiff was born in May 1948 and completed the tenth grade. She worked for the IRS from 1994 until March 18, 2003, first in the area of document perfection and later as a customer service representative. According to her testimony, Plaintiff was asked to take a leave of absence because she was having bad headaches, but could not return to work because she had panic attacks and anxiety. R. at 318-19.

On August 5, 2003, Plaintiff saw Dr. Deborah Mossinghoff, a psychiatrist, for an initial evaluation.[2] Plaintiff reported problems with concentration, focus, memory, and

---

[1] On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security and should, therefore, be substituted as the Defendant in this case. Fed. R. Civ. P. 25(d)(1).

[2] Plaintiff testified she was seeing a psychologist before she left the IRS, but never identified the psychologist. R. at 325. No records of such visits exist in the Record, and the records from Dr. Mossinghoff clearly indicate the initial evaluation occurred on August 5, 2003. R. at 110.

feelings of isolation. She told Dr. Mossinghoff she liked the work, but not the people she worked with because they were incompetent and unhelpful. She began missing work and received notices about being absent without leave. Dr. Mossinghoff diagnosed Plaintiff as suffering from depression and panic disorder, and increased her dosage of Zoloft and started prescriptions for Ambien (to help with sleeplessness) and Klonopin (to address Plaintiff's anxiety). Plaintiff was scheduled to return in two weeks. R. at 110-11.

On August 18, Plaintiff reported she was "sleeping well, notable improvement." She complained of memory problems and indicated she did not "want to do anything, just want to get away from the stress." The Klonopin was "marginally helpful" and Dr. Mossinghoff increased the dosage. The visit lasted twenty minutes. R. at 107-08. Plaintiff returned for her next appointment on September 5, complaining of arguments and confrontations with her husband. She also reported going to the casinos with her mother-in-law while her husband was out of town. During the fifteen minute appointment, Plaintiff and Dr. Mossinghoff "discussed issues between [Plaintiff] and husband over the years," the efficacy of the medication she had been taking, and the wisdom of increasing the dosage of Zoloft. The Zoloft was increased, and Plaintiff was scheduled to return in two weeks. R. at 105-06.

On September 19, Plaintiff reported "having significant problems" with her husband "over going to gamble @ the boats" so she "spent $1200 @ casino 'to get even.'" Dr. Mossinghoff "discussed issues of husband's pattern of dominating her, continued Plaintiff's medications, and added Wellbutrin to the mix. R. at 102, 104. Following this twenty minute appointment, Dr. Mossinghoff wrote a letter opining Plaintiff "exhibits symptoms of depressed mood[,] desperation[,] frequent crying spells with erratic affective outburst, erratic sleep patterns . . . hopeless, helplessness, psychomotor retardation, alternating with agitation, poor concentration and focus and intermittent suicidality." Dr. Mossinghoff also indicated Plaintiff "is completely and totally disabled at this time and incapable of any type of work. She is incapable of meeting any production norms, tolerating interactions with any peers, supervisors, or clients, or

2

meeting any kind of expected work schedule." R. at 103.[3] The appointment that day lasted twenty minutes.

On October 3, 2003, Plaintiff told Dr. Mossinghoff she was still having arguments with her husband about going to the casino, even though Plaintiff claimed to have gone only once since her last appointment. She also reported her husband did not believe in depression or mental illness, and the possibility of having him visit the doctor was discussed. Plaintiff's medications were continued, her Wellbutrin was increased, and Seroquel was added. R. at 100-01. This appointment also lasted twenty minutes.

Plaintiff had a one-hour appointment with Dr. Mossinghoff on October 24, 2003, during which she reported continued discord with her husband over her gambling activity. No changes were made to Plaintiff's medication, and her present GAF score was a 60. R. at 98-99.

Thereafter, Plaintiff's appointments with Dr. Mossinghoff were set further and further apart, and the form used to document these visits changed. On December 30, Plaintiff reported a decrease in crying episodes and her anxiety level was "fair." Her interactions with others was described as fair and she was "overall, doing well." Dr. Mossinghoff assessed Plaintiff's current GAF at 70. R. at 257-58. On February 13, 2004, Dr. Mossinghoff wrote Plaintiff's "[d]epressed mood still incapacitating." Plaintiff reported being "anxious and worrisome" following the suicide of a friend's son and concerns over her application for Social Security benefits. Plaintiff's Wellbutrin, Klonopin and Seroquel were increased, and the Ambien was discontinued. Plaintiff's GAF score was 55. R. at 255-56.

Plaintiff's application for benefits was denied at the administrative level on February 20, 2004. On March 29, Plaintiff saw Dr. Mossinghoff complaining of increased panic attacks and stress and alleging she was "non-functional outside of home." Plaintiff's GAF score was 45; her medications were not changed and she was

---

[3]The purpose of this letter is unclear. It is addressed "To Whom It May Concern" and references the recipient's alleged role in exacerbating Plaintiff's condition. The context of the latter allegation suggests the letter was intended for a disability insurance company.

3

to return in one month. R. at 253-54. On April 27, Plaintiff reported having completed the paperwork for her disability appeal, and feeling less stressed as a result. She was doing "very well" with her family and reported positive results from the medication. Her GAF score was 55. R. at 251-52. On May 28, Plaintiff reported being "still anxious/panicked" about her disability appeal. Nonetheless, she was going to have her granddaughter stay with her over the summer. The prescription for Seroquel was discontinued in favor of a trial of Gabitril. Her GAF score was 60. R. at 249-50. On June 11, Plaintiff expressed frustration with her mother and sister, but believed the medication was "working well." Her GAF score was 65. R. at 247-48.

On August 4, 2004, Plaintiff reported her mood changed depending on her husband's mood – and he had begun taking Prozac, appeared depressed and irritable, and was not talking to her. The Gabitril was discontinued and replaced with hydroxyzine; Plaintiff's GAF score remained 65. R. at 244-45. On September 27, Plaintiff reported her husband's mood had improved and, consequently, she was doing better in relating to him. She also reported being "pleased" with her current medication, which was continued. Plaintiff's GAF was 65. R. at 230-31.

Plaintiff began seeing Susan Horen, a licensed social worker and counselor, in August 2003 but the first records from these sessions are from December 2003. R. at 264. Notes from these visits are brief and difficult to read, but enough words can be identified to allow one to understand the gist of what Ms. Horen wrote. The visits in December 2003 consisted of discussions about Plaintiff's relationship with members of her family and ways to deal with stress. R. at 264. On January 5, 2004, Ms. Horen wrote a memo opining Plaintiff had symptoms of Major Depressed Disorder and feelings of isolation and had problems concentrating, focusing, and remembering. "She also reports severe anxiety attacks and severe short-term memory loss, which impairs her ability to function on a daily basis." Ms. Horen concluded Plaintiff was "unable to work [or] cope with the demands of employment." R. at 263. The next day, the memo was faxed to social security. R. at 264.

On February 17, 2004, Plaintiff's mood was improving and she was coping with stress in her relationships. R. at 262. Improvement and positive reports are also

4

reflected in visits on April 26, May 1, May 8, and June 11; while there are other visits reported, the records are too illegible to be read.  R. at 259-60.  Records from visits between August 4 and December 8 do not provide any information of substance.  R. at 232-43; 216-29.

A consulting psychologist examined Plaintiff in early February 2004.  Information was solicited from Dr. Mossinghoff, R. at 117, 132, both before and after the examination, but there is no indication Dr. Mossinghoff responded to these inquiries.  During the examination, Plaintiff stated "she likes to visit with friends, go to movies, go to the casino, and play with her grandkids [but] reports not being able to concentrate on her hobbies of putting puzzles together or anything like that."  R. at 114.  She described her daily activities as "talking to her husband, watching TV, trying to do some housechores and laundry," but her activities are limited because she "'can't do it.'"  R. at 115.  The examining consultant opined Plaintiff was mildly to moderately limited in her ability to understand and remember instructions and moderately limited in her ability to sustain concentration, persist in tasks, and maintain pace on work-related tasks.  R. at 115; see also R. at 128 (relevant page from the Psychiatric Review Technique Form).  Another consulting (but non-examining) psychologist completed a Mental Residual Functional Capacity Assessment that mirrored the examining consultant's opinions and further noted "the subjective opinions of the treating sources are inconsistent with the objective findings," most notably the conflict between Plaintiff's alleged limitations and the activities she reportedly engaged in.  He concluded Plaintiff would "benefit from a low-stress setting to facilitate social interaction and adaptation."  R. at 135.

During the January 25, 2006, hearing, Plaintiff testified that she cannot work because she has a panic disorder, cannot concentrate, cries a lot, cannot be with people (except her sister and parents), and is only motivated to spend time at home alone.  R. at 319-20.  Medication helps but "don't correct the problem completely."  R. at 320.  Her activities consist of caring for her grandchildren and household chores; she does not read, watch television or listen to the radio – she does nothing.  R. at 321, 326-27.  However, she likes to go to the casino – purportedly at her psychologist's recommendation, although there is no record supporting this fact.  R. at 322-23.

5

Plaintiff's sister testified Plaintiff cannot follow directions, is forgetful, has crying spells without warning and needs help with everything. R. at 332-35.

The ALJ solicited testimony from a vocational expert ("VE"). The first hypothetical asked the VE to assume a person of Plaintiff's age, education and work history, with no exertional limitations and moderate limitations in her ability to follow and carry out detailed instructions, interact with the public, accept supervision, concentrate, and respond to changes in the work environment. The ALJ defined "moderate limitation" for the VE to mean "is able, has some difficulty, but . . . is able to perform" satisfactorily. R. at 337. The VE testified such a person could return to her past relevant work. R. at 337. The ALJ then added a limitation on contact with the public; the VE testified such a person could return to her past relevant work as a tax clerk. R. at 337-38. However, if the person had "marked limitations in being able to concentrate for extended periods of time, persisting at a job and . . . . keeping up the pace, and that means, basically, not being able to perform successfully, and, also, no interaction with the general public," she could not perform her past relevant work or any other work in the national economy. R. at 338-39. The VE also testified that a person could not exceed twelve to fifteen absences a year or take extra breaks totaling an hour per day. R. at 339-40.

The ALJ determined Plaintiff suffers from depression and panic disorder without agoraphobia, but noted the absence of any clinical findings supporting the high severity necessary to equal or meet a listed impairment. R. at 19-20. The ALJ then assessed Plaintiff's residual functional capacity; in doing so, she discounted Plaintiff's credibility and largely rejected the opinions of those who treated Plaintiff. She noted Dr. Mossinghoff and Ms. Horen did not provide any test results and appear to have relied solely on Plaintiff's statements. Plaintiff's GAF scores were (1) much higher than one would suspect given her complaints, (2) sufficient to suggest someone capable of working, and (3) consistent with the consultative experts' opinions. Plaintiff did not seek treatment until five months after the alleged onset date, which strongly suggests the problem was not particularly serious. Contemporaneous doctor reports suggest Plaintiff's medication was very helpful in relieving Plaintiff's anxiety and depression.

6

Finally, Plaintiff's activities – most notably going to casinos and gambling – were inconsistent with a person who allegedly cannot be around people, cannot concentrate, and can do nothing other than stay at home.

## II.  DISCUSSION

"[R]eview of the Secretary's decision [is limited] to a determination whether the decision is supported by substantial evidence on the record as a whole.  Substantial evidence is evidence which reasonable minds would accept as adequate to support the Secretary's conclusion.  [The Court] will not reverse a decision simply because some evidence may support the opposite conclusion."  Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994) (citations omitted).  Though advantageous to the Commissioner, this standard also requires that the Court consider evidence that fairly detracts from the final decision.  Forsythe v. Sullivan, 926 F.2d 774, 775 (8th Cir. 1991) (citing Hutsell v. Sullivan, 892 F.2d 747, 749 (8th Cir. 1989)).  Substantial evidence means "more than a mere scintilla" of evidence; rather, it is relevant evidence that a reasonable mind might accept as adequate to support a conclusion.  Smith v. Schweiker, 728 F.2d 1158, 1161-62 (8th Cir. 1984).

Plaintiff faults the ALJ for failing to defer to Dr. Mossinghoff's and Ms. Horen's opinions and for discounting her credibility.  The familiar standard for analyzing a claimant's subjective complaints is set forth in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984) (subsequent history omitted):

> While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced.  The adjudicator may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them.
>
> The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just

7

> one factor to be considered in evaluating the credibility of the testimony and complaints. The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
> 1. The claimant's daily activities;
> 2. the duration, frequency and intensity of the pain
> 3. precipitating and aggravating factors;
> 4. dosage, effectiveness and side effects of medication;
> 5. functional restrictions.
>
> The adjudicator is not free to accept or reject the claimant's subjective complaints solely on the basis of personal observations. Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole.

739 F.2d at 1322.

Generally speaking, a treating physician's opinion is entitled to deference. This general rule is not ironclad; a treating physician's opinion may be disregarded if it is unsupported by clinical or other data or is contrary to the weight of the remaining evidence in the record. E.g., Pena v. Chater, 76 F.3d 906, 908 (8th Cir. 1996). In this case, there is more than substantial evidence to support the ALJ's findings. Dr. Mossinghoff's and Ms. Horen's reports are internally inconsistent in that the GAF scores assigned, portions of the narratives, and statements regarding the efficacy of medication demonstrate improvement and functional capacity inconsistent with their conclusions that Plaintiff lacks the ability to work. They are also inconsistent with Plaintiff's testimony. Plaintiff's activities are, for the reasons expressed by the ALJ, inconsistent with Plaintiff's claimed limitations. The only testing actually referenced in the Record was performed by consulting psychologists, and the results are consistent with the picture painted by the favorable portions of Plaintiff's reports.

Certainly, if the Plaintiff's testimony is accepted in its entirety, one might conclude she is incapable of performing work. However, credibility is to be determined by the

8

ALJ, and in this case the Record contains substantial evidence supporting the ALJ's determination as well as her assessment of Plaintiff's residual functional capacity.

### III. CONCLUSION

For these reasons, the Commissioner's final decision is affirmed.
IT IS SO ORDERED.

DATE: July 25, 2007

/s/ Ortrie D. Smith
ORTRIE D. SMITH, JUDGE
UNITED STATES DISTRICT COURT